## Maxey v. Payton et al.

(Decided April 28, 1933.)

W. E. JONES and J. R. WHITE for appellant.

LARIMORE & NICHOLAS and DOWLING & BAIRD and MAX B. HARLIN for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

This case is an aftermath of that of Payton et al. v. Norris et al., reported in 240 Ky. 555, 42 S. W. (2d) 723. In the Norris Case, it appeared that G. H. Maxey, a man of color, had conveyed a certain tract of land in Hart county, containing about 26 acres, to W. E. Payton by a deed dated April 1, 1930, but not recorded by Payton until September 29th of that year. Maxey had in July, 1930, executed to H. F. Norris an oil lease on this land for the consideration of $1, cash in hand paid, together with the usual covenants in an oil lease to develop the land, and, if oil be found, to pay the usual royalties. This lease was recorded in September, 1932. About the same time as this lease was recorded, Payton executed a lease on the same property to the Rex-Pyramid Oil & Gas Company.

A controversy at once arose between Norris and the Rex-Pyramid Oil & Gas Company as to who had the better right to the land. The Norris Case decided that the consideration of $1 paid Maxey for the lease was not such a valuable consideration as to make Norris a bona fide purchaser from Maxey as against Payton's claim under his unrecorded deed of April 1, 1930, and so Payton and his lessee prevailed over Norris. In

this Norris Case, Maxey testified, as did Payton, that he executed the deed under which Payton claimed on April 1, 1930.

The instant suit was brought by Maxey against Payton, H. L. Dunnagan, and Jessie Bryant; the last named being the deputy clerk of Hart county who took Maxey's acknowledgment to the deed bearing date April 1st. In this suit, Maxey claims that he swore falsely in the Norris suit, supra; that in truth and in fact he executed no deed to the 26 acres of land in question to Payton in April, 1930, and not until September, 1930, and then only after an oil well, known as the Mc-Kinney well, had been brought in upon some nearby land, thus indicating the probable worth of this 26 acres in question for oil. Maxey averred that he was a colored man, ignorant and illiterate, that he implicitly trusted Payton, with whom he had had, over a long period of time, many business transactions, and for whom he had worked as a tenant on his farms; that prior to the spring of 1930 he had become indebted to Payton, and that Payton, at the time Maxey made the lease to Norris in the summer of 1930, had a lien on this 26 acres to secure him in the payment of what Maxey then owed him; that Payton, after the McKinney well had, in the early part of September, been brought in, came to see him, and, much incensed at the Norris lease, threatened to put him in the penitentiary for having leased land on which he (Payton) had a lien, but agreed with Maxey that, if he would deed him this 26 acres, have the deed dated back to April, and in any subsequent litigation that might arise with Norris testify that the deed had been made in April, he would not only forego prosecuting Maxey, but he would also, after leasing the land, deed it back to Maxey with the right to one-eighth of any oil to be found on it. Maxey then alleged that in his ignorance and in his fear, and acting under the duress of Payton, he had done as Payton demanded, but that Payton had refused to deed him back the 26 acres of land as Payton had agreed. It was the object of this suit to compel Payton to convey the land to Maxey as Maxey claimed Payton had agreed to do. Payton's answer was a complete traverse of Maxey's allegations.

The proof for Maxey disclosed these facts: One night about 10 o'clock in late September, 1930, and just

after the McKinney well had been brought in, Payton appeared at the home of Maxey. The latter had gone to bed, but Payton got him up and got him out on the front porch, and proposed to him that Maxey deed the 26 acres to him and date the deed back to April. He told Maxey that he (Maxey) had gotten nothing out of the Norris lease but $1, and would get nothing further out of it, whereas, if he did as Payton demanded, he would make some money; that, if he did not do as Payton demanded, the latter would put him in the penitentiary for having made the lease to Norris at a time when Payton had a lien on the property. Maxey took time to consider the matter, and Payton left, but returned after midnight, and again got Maxey up and insisted that Maxey do as he demanded. Maxey undertakes to establish these facts by himself and his two daughters, who, at the time when Payton arrived, were asleep in the front room from which a window opened out on the porch where Maxey and Payton were talking; the daughters having been awakened by the conversations. On the next day, Maxey in company with Dunnagan went to Hardyville, some ten miles or so away, to execute the deed Payton demanded. Dunnagan had been a deputy county clerk, and was thoroughly capable of writing a deed. Dunnagan lived nearby to Maxey, and it appears that there was a notary public in the neighborhood available to take Maxey's acknowledgment. Instead, however, of using this notary's services and instead of Dunnagan writing the deed, as he had so often done in other transactions for Payton, Dunnagan took Maxey over to Hardyville, where they went to Jessie Bryant, who ran the post office and was a deputy county clerk; that on their arrival there Bryant wrote the deed out on his typewriter, dated it back to April 1st, had Maxey to sign it and acknowledge it, and then dated the certificate of acknowledgment back to April 1st. Maxey undertakes to establish these facts by his testimony and that of an old blind negro, Tom Victor. Victor testifies that he was at Bryant's store in September, 1930, just after the McKinney well had been brought in; that Maxey and Dunnagan came to that store, and that, after they had had some talk with Bryant, concerning the purport of which Victor did not undertake to testify, Maxey came outside the door and sat with him or chatted with him while Bryant wrote something on what Victor called ''Bryant's peck-

ing machine'' (meaning, of course, his typewriter); that, when Bryant had completed his work, Maxey was called in to the office, and that later Maxey and Dunnagan left. Maxey's son testified that in October Payton, who had come over to get Maxey to testify in the litigation that had arisen in the Norris suit, supra, told Maxey's son, who had rather belligerently inquired into Payton's activity with his father, what the deal was, and this son testifies that it was just as Maxey claims it to have been. There lived nearby to Maxey a white man by the name of Franklin who testified for Maxey.

The courthouse of Hart county some time previous to this had burned down. In order to establish their titles as best they could, landowners of Hart county were re-recording their deeds. Maxey had three deeds under which he held the 26 acres in question. They were recorded in September just before his deed to Payton was recorded, and they as well as Maxey's deed to Payton were recorded by Dunnagan. Maxey testified that he turned over these three deeds to Dunnagan the day he executed the Payton deed at Hardyville. Now Franklin testified that he had been aroused the night Payton made his visit to Maxey in September and has seen Payton at Maxey's home. He also testified that in the preceding summer he had seen these three deeds in question under which Maxey held title in Maxey's possession, and that, after the Norris litigation arose, Payton had visited him with the request that he keep quiet about what he knew, and that, if he (Franklin) would ''scratch Payton's back, Payton would scratch his.'' Maxey further testified to the long years of business transactions he had had with Payton, not only as his tenant but also as his debtor in the purchase of land, and of his confidence and trust in Payton, and of the fact that he was in debt to Payton at the time he deeded the 26 acres to Payton, whether that occurred in April or September, he not knowing the exact amount of the indebtedness, as he always left the calculation of that to Payton.

The proof for Payton disclosed this state of case: Maxey had been the owner of a 79-acre tract of land on which there was a mortgage. Payton had either indorsed these mortgage notes or held the second lien against the property; the record not being quite clear as to which. At all events, Payton was interested in protecting himself in any sale had of the 79 acres under

a foreclosure by the holder of the first mortgage. This mortgage was foreclosed and the property sold at the courthouse door. Payton bought it in to protect himself. After some labor, Maxey's attorney elicited from Payton that there was an agreement on Payton's part to reconvey this 79 acres to Maxey if Maxey should ever pay off the debt which Payton had had to pay in buying in the property at the courthouse door. All this occurred some time prior to April, 1930. Payton admitted that he allowed Maxey to retain possession of the 79 acres of land without charging him any rent for it, although perhaps he was charging interest on the debt. Maxey was in debt to Payton because of other transactions. On a balance being struck in April, 1930, Payton discovered that, including the 79-acre debt and the other obligations that Maxey owed him for supplies furnished Maxey wherewith to live, Maxey owed him in the neighborhood of $2,800. On his taking this up with Maxey, they agreed that, if Maxey would destroy the contract which he had with Payton concerning the reconveyance of the 79 acres of land, and would convey to Payton the 26 acres of land, Payton would cancel Maxey's indebtedness and call everything square. Payton claims that it was pursuant to this agreement that Maxey executed the deed in question. He testified posiively that the deed was executed on April 1, 1930; he getting Dunnagan to attend to the matter for him. To establish these facts, Payton produced himself and Dunnagan, together with Bryant, the latter of whom testified that the deed was made on April 1st as his certificate as deputy clerk indicated. Payton also produced two witnesses who claimed that he undertook to sell or lease to them for agricultural purposes this 26 acres in the spring of 1930. Dunnagan says that on the execution of the deed he destroyed the contract with reference to the reconveyance of the 79 acres and gave to Maxey the notes that Maxey had given to Payton, and that Maxey destroyed them. Payton admitted that he had in the fall of 1930 leased the 79 acres, the 26 acres, and another small tract to the Rex-Pyramid Oil & Gas Company for the consideration of $6,000, cash in hand paid, and the usual covenants in an oil lease to develop the land and to pay, if oil were discovered, a royalty of one-eighth of the oil removed, and that the land had been developed, there being some five or six wells on these 26 acres, and that he was drawing royal-

ties of about $200 a month from the total acreage leased.

In rebuttal, Maxey denied that he ever made any such settlement with Payton as thus testified to by Payton, or that he ever got his notes back. On the contrary, he claims that the contract which Payton referred to was executed in September at the time he made his deed, and not only covered the 79 acres, but also embodied the agreement he was asserting with reference to the 26 acres. Payton denied, as did Dunnagan, that there was any such contract made in September or any other time, or that any other contract than the one concerning which they had testified was ever entered into by Payton and Maxey. Payton admitted the visits to Maxey during the night in September, 1930, but claimed that his first visit was to Maxey in the latter's capacity as one of the trustees of the colored church that owned some land upon which Payton wished to get a lease after he had heard of the McKinney oil well. He testified that Maxey directed him to see certain other trustees of the church, and that, when he went to see them, he also discovered that a man by the name of Peter Helm owned some land nearby, but, as Helm did not live on his land or in the neighborhood, and as none of these trustees seemed to know where he lived, and as one of the trustees suggested that Maxey might know, he went back after midnight to see Maxey in order to get the address of Helm. Dunnagan admits taking Maxey over to Hardyville in the latter part of September, but says that he did so in order to let Maxey get some twine wherewith to bind his corn, and that this was the sole purpose of their trip to Hardyville. Dunnagan claims at the time Maxey was working on one of Dunnagan's farms, and, as Dunnagan was going to Hardyville anyhow and had this twine on another farm, he allowed Maxey to use it and took him along to get it. Both Dunnagan and Payton claim that the three deeds under which Maxey held his 26 acres were turned over to them in April. Payton admits that he allowed Maxey to keep also the 26 acres of land which was only pasturable land in the summer of 1930 rent free, and made no objection to Maxey leasing the property to a nearby neighbor during that summer for purposes of pasturage. There was a great deal of proof for Payton to establish that

which was really not contradicted, to wit: Maxey's participation in the Norris litigation, the testimony he gave in court and statements made out of court to representatives from the Rex-Pyramid Oil & Gas Company to the effect that Maxey had made the deed in question to Payton in April, 1930. Payton denied any visit to Franklin, and attributed Franklin's testimony to hostile feeling towards him on the part of Franklin arising out of some other matters.

On this proof the case was submitted to the chancellor, who dismissed Maxey's petition, and he has appealed.

Payton takes the position that this suit of Maxey is in effect an attack upon the certificate of acknowledgment made by Bryant; that under our authorities (see Kentucky West Virginia Gas Co. v. Maynard, 242 Ky. 490, 46 S. W. [2d] 788) it requires clear and convincing proof to overcome the certificate of acknowledgment and that Maxey failed to establish by clear and convincing proof that the certificate of acknowledgment was false. Although Maxey's proof at least points the finger of suspicion very directly towards Payton, yet there is nothing shown in this record as to why Bryant, the deputy county clerk, should have made a false certificate, or have testified falsely in this case. But, passing all this, and conceding arguendo that Maxey's proof was sufficient to show that the deed was made in April instead of September, we are yet confronted by the proposition that the deed was antedated, if it was antedated, for the sole purpose of defeating the Norris lease, and that the agreement with Payton to reconvey the property to Maxey was in consideration of Maxey entering into this conspiracy to defeat the Norris lease, not only by antedating the deed, but also by swearing falsely, as he did, in any litigation that should arise with Norris. That such a contract is illegal and if executed the courts will leave the parties where they find them cannot be denied. As said in the case of Fears v. United Loan & Deposit Bank, 172 Ky. 255, 189 S. W. 226, 231:

"The common-law rule and the one applied to such transactions is that where money is paid and personal property transferred in performance of such [illegal] contract, neither the money nor the property can be recovered, although the other party

should refuse to perform his part of the contract, the policy of the law being that, the parties being in equal wrong, a court of equity will not give aid to either of them, but will leave them just as it finds them and in the position in which they have placed themselves."

While recognizing this principle, Maxey seeks to avoid its application to him by relying on the principle thus laid down in the case of Hargis v. Hargis, 207 Ky. 366, 269 S. W. 297, 299:

"The general rule is, in cases of executed contracts, where both parties are guilty of actual fraud, a court of equity will not lend its aid to either, but leave each to the consequences of his own wrongdoing. To apply this rule, the parties must be in pari delicto, each equally guilty of the fraudulent intention and the fraudulent acting, with equal knowledge and equal willingness. When that is not the case, when there is imposition, duress, oppression, threats, undue influence, taking advantage of necessities or weakness, the party thus placed at disadvantage, although participating in the fraud, may be relieved in a court of equity as against his co-wrongdoer."

We are of opinion, however, that the evidence does not bring Maxey within this exception. It is true that in his brief and pleadings he claims to be an old, illiterate, and ignorant negro, but the evidence shows him to be 59 years old, and his testimony in this case is given in such a clear fashion and with such understanding as to preclude the idea that he is not acquainted with business, though, perhaps, he may not be able to read or write overly well. The test of literacy based on ability to read and write is by no means a test of business capacity. Maxey's testimony is far clearer and more intelligently given in this case than that of Payton.

He next claims that he was under duress because of Payton's threat to send him to the penitentiary. Whatever fears he may have been under because of Payton's unexpected visit to him in the night certainly had time to dissipate by the following day before he went over to Hardyville with Dunnagan. At least he had opportunity to consult with friends or counsel, and

the business capacity he displayed in this record certainly would have prompted him to do so had he been actuated solely by fear of Payton's threat. Over a long period of time during the Norris litigation, he continued to aid and abet Payton in Payton's effort to defeat the Norris lease, and at no time did he ascertain whether or not Payton's threats had any efficacy or not. On the other hand, Maxey himself admits that Payton told him he had gotten nothing out of the Norris lease, as indeed he knew, having only secured $1 for the execution of that lease, and that Payton told him that he would make some money by deeding the land to Payton and letting the latter lease it, have it developed with a reconveyance to follow accompanied by a nice paying royalty. Maxey's conduct leads to the inescapable conclusion that he was motivated as much by greed as he was by fear, and that his present claim that he acted as he did under the fear of Payton sending him to the penitentiary is an afterthought. We conclude, therefore, that Maxey does not bring himself within the exception to the rule, which being true, he must be left where he put himself. The lower court did not err in dismissing his petition.

The judgment is affirmed.